## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MAINE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| | : | |
| JUBILANT GENERICS LIMITED, | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | |
| | : | |
| DECHRA VETERINARY PRODUCTS, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND<br>OTHER RELIEF</u>

Plaintiff Jubilant Generics Limited ("Jubilant"), by and through its undersigned attorneys, alleges as follows for its Verified Complaint against Defendant Dechra Veterinary Products, LLC (collectively, "Dechra"):

## <u>NATURE OF THE ACTION</u>

1.     This action is the result of a company (Dechra) failing to comply with certain promises and obligations it owes a fifteen (15) year business partner (Jubilant) and, instead, choosing to steal its partner's confidential information and property when the relationship ended.

2.     Specifically, Jubilant and Dechra entered into a Licensing and Supply Agreement on December 10, 2007, which was modified with Amendment #1 on March 28, 2018 (collectively, the "Agreement"). (A copy of the Agreement is attached as Exhibit A).[1]  On January 18, 2007, Jubilant had Dechra execute a "Confidentiality Agreement" before Jubilant would share <u>any</u> confidential and proprietary information with Dechra. The information identified in paragraphs 37 and 38 is Jubilant Confidential Information and intellectual property (collectively, "Confidential Information") under the Confidentiality Agreement. (A copy of the Confidentiality Agreement is attached as Exhibit B).

3.     Under the Agreement, Jubilant agreed to manufacture, and Dechra agreed to sell, Enrofloxacin, a fluoroquinolone antibiotic chewable tablet (22.7 mg, 68 mg and 136 mg) (the "Product") used for the treatment of animals, in the United States.

4.     As part of the Agreement, Jubilant provided Dechra with its Confidential Information and property so that Dechra could sell  Product throughout the United States. In

---

[1] The Agreement was originally signed by, and between, Putney, Inc., and Jubilant Organosys, LTD.  Dechra is the successor/assignee company of Putney and Jubilant is the successor/assignee company of Jubilant Organosys.

addition, certain information was created and/or developed during the term of the Agreement in order for Dechra to obtain the registration/approval from the United States Food and Drug Administration ("USFDA") to sell the Product throughout the United States.

5. Any information created and/or developed under the Agreement was identified in the Agreement as "Project IP." All Project IP, according to the Agreement, was owned by Jubilant.

6. Thus, when bio-equivalence studies (both pilot and pivotal scale) and palatability studies and reports (collectively, "Bio-Equivalence Studies") were created under the Agreement, the Bio-Equivalence Studies were Project IP and owned by Jubilant. The Bio-Equivalence Studies were also Jubilant Confidential Information.

7. The relationship between Jubilant and Dechra ended on February 28, 2023. Hence, Dechra was required to return all Jubilant Confidential Information, including the Bio-Equivalence Studies, to Jubilant no later than February 28, 2023. Dechra was also supposed to stop using Jubilant Confidential Information on or before February 28, 2023.

8. Instead of honoring and complying with the above duties and obligations, Dechra informed Jubilant on February 28, 2023, that it was keeping all Jubilant Confidential Information, including the Bio-Equivalence Studies, and transferring the Confidential Information to at least one third party that is not authorized to receive, access, retain or use Jubilant Confidential Information.

9. Dechra retaining, using and transferring Jubilant Confidential Information is a breach of the Agreement. It is also a violation of Maine and Federal law.

10. In order to avoid litigation, Jubilant made several overtures to Dechra after February 28, 2023 asking Dechra to return Jubilant Confidential Information. Dechra rejected each overture.

11.     Consequently and since Dechra's actions are a clear violation of the Agreement, Confidentiality Agreement and the law, Jubilant now brings suit against Dechra for breach of the Agreements, misappropriation of trade secrets, and replevin.

12.     In doing so, Jubilant requests that this Court enter an order enjoining Dechra from using, possessing, accessing or transferring Jubilant Confidential Information, and award Jubilant compensatory and punitive damages for Dechra's intentional and illegal acts.  Jubilant also requests that the Court order Dechra to immediately return all Jubilant Confidential Information, including the Bio-Equivalence Studies, to Jubilant and award Jubilant its attorneys' fees.

## THE PARTIES AND RELEVANT PERSONS

13.     Jubilant Generics Limited ("Jubilant") is a limited corporation established in the country of India with its principal place of business located at 1-A, Sector 16-A. Nodia-201 301 UP, India.

14.     Dechra Veterinary Products, LLC ("Dechra") is a Delaware limited liability company with its headquarters and principal place of business located at 7015 College Boulevard in Overland Park, Kansas.

15.     TRiRx Pharmaceutical Services is a Connecticut Corporation with its headquarters and principal place of business at 101 Merritt 7 in Norwalk, Connecticut.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because Jubilant's claims against Dechra under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.*, raise a Federal question.  Jubilant's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the Federal question that they form part of the same case or controversy.

17.     Alternatively, this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different countries and exceeds the value of $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over Dechra because it conducts business in this District and some of Dechra's actions identified in this Complaint took place in this District. For example, Dechra negotiated the Agreement in this District, received and used Jubilant's Confidential Information in this District, manufactured and distributed the Product covered by the Agreement in this District, and negotiated for Maine law to apply to the Agreement from this District. Venue is proper in the United States District Court for the District of Maine, pursuant to 28 U.S.C. § 1391(b), because Dechra does business in this District, the property Jubilant seeks to be returned is located in this District, and a substantial part of the events giving rise to Jubilant's claims occurred in this District.

## BACKGROUND

## Jubilant and Dechra

19.     Jubilant is a global pharmaceutical company that specializes in the development, manufacture, and supply of high-quality generic drugs in the United States, Canada, Europe, and other emerging markets. Jubilant has a diverse portfolio of products, which includes formulations and active pharmaceutical ingredients (APIs) across various therapeutic categories such as cardiovascular, central nervous system, and respiratory diseases. With a focus on innovation and customer-centricity, Jubilant aims to provide affordable healthcare solutions to patients across the world.

20.     Dechra is a global veterinary pharmaceutical company that develops, manufactures, and distributes a wide range of animal health products for both companion and food-producing

animals. The company's products include pharmaceuticals, vaccines, and supplements for various

therapeutic areas, including dermatology, ophthalmology, endocrinology, and gastroenterology.

21.     In 2007, Jubilant decided to enter the United States market for the selling of the

Product.  The Product is a fluoroquinolone antibiotic tablet used for the treatment of animals.  It

is highly effective in the treatment of respiratory, urinary, gastrointestinal, and skin inflammation

in dogs and cats.

22.     As part of its due diligence in examining the Product market, Jubilant met with

Dechra, then known as Putney, Inc., about the possibility of Jubilant exclusively manufacturing

and supplying Product to Dechra and Dechra having an exclusive license to market and sell the

Product to the United States market.

23.     After several meetings and negotiations, Dechra and Jubilant entered into a

Licensing and Supply Agreement ("Agreement") on December 10, 2007.  The Agreement was

Amended on March 28, 2018.  Jubilant and Dechra also executed a "Confidentiality Agreement"

on January 18, 2007.

### **Key terms of the Agreement**

24.     Section 1.1 of the Agreement contains the following pertinent definitions:

- "Bio-equivalence Studies" means bio-equivalence study(ies) to be performed by Putney, including, without limitation, if required or needed, in connection with the filing of a Product ANADA;

- "Confidential Information" means and includes all scientific, manufacturing, technical, clinical, regulatory, financial, pricing, commercial, sales, marketing, customer and other information and data related to any of the Product, the API, or to the objects of this Agreement, whether disclosed orally or in Documents;

- "Existing IP" means IP owned or controlled by a Party as at the Effective Date and which is used in connection with the development of the Product or any activities of the Parties related to this Agreement;

- "IP" means any patent, registered design, copyright, database right, design right, utility model, trademark, trade dress, service mark, application to register any

22832811 v3                                                    6

of the aforementioned rights, trade secrets, rights in know-how, rights of confidence and any other intellectual or proprietary right of any nature whatsoever of a Party;

- "Project IP" means any IP that is created or conceived by either Party in the performance of, or in connection with, the development activities as provided in this Agreement, provided, however, that any trademark or intellectual property as provided in Section 8.4(a) herein shall be excluded from the definition of "Project IP;"

- "Supply Interruption" shall mean a situation where one or more of the following occurs:

    (i) Jubilant, after accepting a Putney Firm Purchase Order, fails to deliver at least eighty-five percent (85%) of the amounts indicated in such Putney Firm Purchase Order for ninety (90) days or more subsequent to the indicated date of delivery in the Putney Firm Purchase Order; or (ii) Jubilant, after accepting a Putney Firm Purchase Order, notifies Putney, in advance of the indicated date of delivery, of its inability to supply Putney with at least eighty-five percent (85%) of such confirmed Putney Firm Purchase Order within ninety (90) days subsequent to the indicated date of delivery in the Putney Firm Purchase Order.

25.    Section 2.1(a), Submission and Maintenance of Regulatory Approvals:

Jubilant shall provide Putney with information about all research and development, quality testing, manufacturing, and all related information regarding the API. or Product as needed to enable timely submission of the Product ANADA(s) and such annual reports, or any supplements, in accordance with this Agreement and the Act. Putney will provide Jubilant with copies of relevant portions of such submissions to enable manufacture of the Product by Jubilant and to allow Jubilant to update and/or maintain any Regulatory Approvals required by Jubilant in connection with the Product.

26.    Sections 2.2(a) and 2.2(b), "Development & Filing for Regulatory Approval of Product ANADA," state that Dechra shall:

- own all right, title and interest in and to the Regulatory Approvals, including, without limitation, the Product ANADA(s);

- fund the costs of the first pilot (if required) and pivotal Bio-Equivalence Studies required for the Product and keep Jubilant fully informed of the status of the conduct and completion of the Bio-Equivalence Studies;

- provide Jubilant with reports as reasonably requested during the Term relating to the Bio-Equivalence Studies and Palatability Studies (collectively, "Bio-Equivalence Studies") and any other research and development efforts

undertaken by Putney, stating in reasonable detail all significant progress achieved and material difficulties encountered in the research and development of the Product since the last such report.

27. Section 6.2, "Supply Interruption," states:

In the event of a Supply Interruption, Putney shall have the right, at its option, to either (i) have Jubilant supply the undelivered quantity of Product at a future date agreed upon by the parties (a failure of which future delivery obligation shall also be deemed a Supply Interruption), or (ii) source such undelivered quantities of the Product or a reasonable alternative from any third party (and Jubilant shall cooperate and provide such third party with all available information and technology to so manufacture such Product). If Jubilant fails to supply the undelivered quantity of the Product and Putney sources the Product from a third party, and to such extent, the purchase obligation of Putney, if any, shall stand reduced and the Minimum Quantity under Section 7.6 for such period shall likewise be reduced to the extent of such undelivered quantities. Putney shall not be obligated to make any payment to Jubilant pursuant to this Agreement for the Product not supplied to Putney.  During the period of any Supply Interruption, Jubilant shall be responsible for, and shall remit to Putney upon provision of written notice, the positive difference between the price paid by Putney to a third party for replacement quantities of such undelivered quantities of the Product [and] the price for such Product that would have otherwise been payable to Jubilant under this Agreement in the absence of a Supply Interruption, except to the extent the quantity of the Product purchased by Putney from a third party exceeds the quantities of Product that would have been supplied by Jubilant had a Supply Interruption not occurred. The remedy of reimbursement of the positive difference in price shall be Putney's sole and exclusive remedy in the event of a Supply Interruption, subject to Putney's rights to terminate pursuant to Section 13.2(g)

28. Section 8.4(b), "Intellectual Property," states that:

Each Party agrees that it shall not use the other Party's Existing IP for any purpose not expressly provided for in this Agreement. **The Parties further agree not to use any Project IP for any other purpose except as expressly provided for pursuant to this Agreement. All Project IP, upon its creation, shall vest in and be owned by Jubilant, and Jubilant shall be entitled to seek such appropriate means of protection of such Project IP anywhere in the world.** (emphasis added).... Putney acknowledges and agrees to assign, transfer and convey any interest that it may have or acquire

22832811 v3

8

in the Project IP and that it shall do and execute, and shall cause its employees, to execute any instrument, document or agreement as may be required to effectuate such assignment, transfer and conveyance.

29.     Jubilant and Dechra also agreed that Project IP is owned by Jubilant in Amendment #1 dated March 28, 2018.

30.     Section 10.2, "Use of Information," states that:

> **Each Party shall use Confidential Information disclosed to it by the other Party only for the purpose of exploiting its rights and fulfilling its obligations pursuant to this Agreement**. **Each Party shall treat as confidential and, without the prior written consent of the other Party, shall not disclose to any Person any Confidential Information.** However, each Party may make Confidential Information received from the other Party available in confidence only to its Affiliates and to such of its employees, agents, consultants and contractors who need to know the information for the purposes of performing that Party's rights and· fulfilling its obligations pursuant to this Agreement, and provided that such agents, consultants and contractors have undertaken similar obligations of confidentiality with respect to the Confidential Information. **Each Party shall be liable for any breach by any of its Affiliates and by those of its employees, agents, consultants and contractors of the obligations of confidence herein set forth.** (emphasis added)

31.     Section 10.3, "Return of Materials," states that:

> Upon termination for any reason whatsoever or expiration of this Agreement, each Party shall cease to make use of the Confidential Information disclosed to it by the other Party and shall either return to the other Party all Documents bearing Confidential Information and all copies thereof or certify to the other Party in writing that such Confidential Information and all copies thereof have been destroyed.

32.     Sections 13.2(a) and 13.2(g) allow Dechra to terminate the Agreement if:

- Jubilant breaches a material term of this Agreement, which breach is not remedied within sixty (60) days' after written notice of such breach is given by Putney to Jubilant;

- upon the occurrence of (i) a Supply Interruption which is continuing for two (2) or more consecutive calendar quarters, or (ii) five (5) or more Supply Interruptions occurring during the Term.

33.    Finally, Section 14.1 of the Agreement mandates that the Agreement "shall be governed by the laws of the State of Maine as such laws are applied to contracts entered into and to be performed within such state" and "except for any violation of any obligation under Section 10, all Disputes relating in any way to this Agreement shall be resolved exclusively through arbitration conducted in accordance with the arbitration rules of the International Chamber of Commerce as then in effect."

34.    Section 10, "Confidentiality," concerns/covers the use of Confidential Information for a limited purpose only during the Term (Section 10.2) and return (Section 10.3) of Confidential Information.

35.    Thus, any dispute over the misuse and/or failure to return or destroy Confidential Information can be brought in state or Federal Court and all other disputes arising out of the Agreement must be resolved through Arbitration.

### Jubilant shares its Confidential Information and IP with Dechra

36.    Dechra and Jubilant operated under the Confidentiality Agreement and the Agreement from December 10, 2007 to December 13, 2021.  Specifically, for approximately 14 years Jubilant supplied Product to Dechra and Dechra then distributed and sold Product throughout the United States.

37.    In view of the promises and assurances of confidentiality given by Dechra under the Confidentiality Agreement and as part of the Agreement, Jubilant provided scientific, manufacturing, technical, clinical, regulatory, financial, pricing, commercial, sales, marketing, customer and other information and data to Dechra in order for Dechra to sell and distribute the Product throughout the United States.

38.     For example, Jubilant provided chemistry manufacturing and control information, as well as the technical requirements, for manufacturing the Product, all of which was required for obtaining the Product ANADA approval from the USFDA. The Product ANADA approval # 200-551 was issued by USFDA.

39.     The information described in paragraphs 37 and 38 is some of Jubilant's most highly sensitive and confidential information.  Jubilant receives significant economic and other business benefits as a result of the information not being publicly available.

40.     Not surprisingly then, a competitor could cause severe harm to Jubilant if it was able to obtain the information described in paragraphs 37 and 38, and then use this information to benefit itself and/or harm Jubilant.

41.     When it shares confidential information with third-parties, Jubilant protects the information described in paragraphs 37 and 38 by, among other things, entering into a confidentiality agreement before anything is shared with the third-party that a) prohibits the third-party from disclosing, or causing the disclosure of, confidential information to any outside party or parties; b) limits the disclosure of confidential information to representatives of the third-party who need-to-know the information in order to perform tasks in accordance with the requirements of the agreement between Jubilant and the third-party; c)  requires the third-party to obtain written assurances from its representatives that the representatives will keep the confidential information confidential; d) mandates that the third-party will insure that its representatives protect the confidential information in the same manner the representatives protect the confidential information of the third-party; and e) requires the third-party to assume liability for, among other things, any breach of a representative's confidential information obligations.  The Confidentiality Agreement also allows Jubilant to "seek and obtain injunctive relief or other equitable relief"

against any disclosure of confidential information by the third-party.

42.     Jubilant only shared the Confidential Information described in paragraphs 37 and 38 because Dechra agreed to, pursuant to the Confidentiality Agreement and the Agreement, a) use the Confidential Information only for the purpose of fulfilling Dechra's obligations under Agreement, b) treat the Confidential Information as confidential; c) not disclose the Confidential Information to any person or entity who did not have Jubilant's permission to receive, review, access or possess the Confidential Information and d) cease using the Confidential Information when the Agreement and Jubilant's relationship with Dechra terminated.

43.     Dechra did not have access to the Confidential Information described in paragraphs 37 and 38 until it executed the Confidentiality Agreement and the Agreement, and promised to protect the Confidential Information in the above-described manner.

44.     Put another way, Dechra would not have had access to the Confidential Information described in paragraphs 37 and 38 but for agreeing to comply with the terms of the Confidentiality Agreement and the Agreement, and agreeing to protect Jubilant's Confidential Information.

## The Bio-Equivalence Studies

45.     Under the Agreement, Dechra prepared Bio-Equivalence Studies for the Product. Bioequivalence studies are where two drugs or two sets of formulation of the same drug are compared to show that they have nearly equal bioavailability and PK/PD parameters. These studies are often done for generic drugs or when a formulation of a drug is changed during development.

46.     Given the robust and extensive Confidential Information provided by Jubilant to Dechra, Dechra was able to obtain waiver from compliance and submission of all the sections of the Bio-Equivalence Studies from the USFDA, which waiver is evidenced by the Freedom of Information Summary for ANADA # 200-551 for the Product.

47.     Pursuant to the Agreement,  Dechra was to keep Jubilant "fully informed of the status of the conduct and completion of the Bio-Equivalence Studies."

48.     Accordingly, the Bio-Equivalence Studies were undertaken by Dechra in the performance of, or in connection with, the development activities as provided in the Agreement, and as described in paragraph 46.  Moreover, the Bio-Equivalence Studies were heavily dependent upon the Confidential Information provided by Jubilant.

49.     Consequently, the Bio-Equivalence Studies are "Project IP" under the Agreement.

50.     According to Section 8.4(b) of the Agreement, "all Project IP, upon its creation, shall vest in and be owned by Jubilant."

51.     Hence, the Bio-Equivalence Studies are Project IP and therefore owned by Jubilant.

52.     The Bio-Equivalence Studies are also Jubilant Confidential Information.

**Dechra terminates and then violates the Agreement**

53.     On July, 14, 2021, the United States Food and Drug Administration ("FDA") issued an Import Alert for the Product (the "Alert").  The Alert essentially barred Jubilant from sending Product into the United States.

54.     As a result of the Alert, a Supply Interruption occurred and Dechra notified Jubilant that it was terminating the Agreement on December 13, 2021.  Dechra's notice of termination was in accordance with Section 13.2(g), "Supply Interruption," of the Agreement.

55.     The Alert did not, however, ban the distribution or use of the Product already manufactured and sent to the United States by Jubilant before the Alert.  Thus, Dechra was required to exhaust the Product manufactured by Jubilant, and pay Jubilant for the sale of the Product, before sourcing the Product from a third party.

56.     In addition, Dechra is also required to share a portion of the revenue realized on the

sale of the Product based on the formula given in the Agreement. Jubilant received the last share payment in March 2023 and after accounting for the quantity of the Product that Dechra has indicated as sold in the United States, Dechra still has unsold stocks of the Product already manufactured and sent to the United States by Jubilant before the Alert.

57.     Similarly and pursuant to Section 13.5 of the Agreement, Dechra can continue to sell unsold stocks of the Product in the United States for up to two years after Dechra provided its notice of termination (i.e. through December 13, 2023).

58.     Thus, certain terms of the Agreement, including the terms regarding Dechra's protection of Jubilant Confidential Information, remained in effect after December 13, 2021.

### Dechra attempts to purchase Jubilant's Confidential Information and the Parties negotiate a continuing relationship

59.     In December 2021, January 2022 and again in March 2022, Dechra offered to pay Jubilant several hundred thousand dollars in exchange for Jubilant transferring ownership of its Confidential Information to Dechra.  In fact on January 2, 2022, Dechra wrote that it "understood Jubilant is the owner of the [Confidential Information]" and was "willing to compensate Jubilant for this information." In fact again on March 30, 2022 Dechra wrote that "Dechra is still interested in purchasing the Project IP and welcomes a discussion with Jubilant solely on the topic."

60.     After Jubilant rejected Dechra's offers, Dechra and Jubilant engaged in over one year of negotiations regarding the manufacturing and distribution of Product, the use and return of Jubilant Confidential Information and a continuing relationship between Dechra and Jubilant.

61.     During these negotiations, Jubilant repeatedly demanded that Dechra turnover the Bio-Equivalence Studies to Jubilant, as was required by the Agreement.

62.     Dechra, unfortunately, refused to do so.

63.     Dechra did, however, continue to sell Product manufactured by Jubilant during the

negotiations.

64.     On February 28, 2023, Dechra abruptly and effectively terminated negotiations with Jubilant.  In doing so, Dechra informed Jubilant that it would no longer fulfill its obligations regarding the protection of Jubilant Confidential Information.

65.     As a result of the February 28, 2023 notice from Dechra, and as required by Section 10.3 of the Agreement, Dechra was to "cease using [Jubilant] Confidential Information" and either "return [Jubilant] Confidential Information" to Jubilant or "certify to [Jubilant] in writing that such Confidential Information and all copies thereof have been destroyed" on or shortly after February 28, 2023.

66.     It was also required Dechra to turnover the Bio-Equivalence Studies to Jubilant.

67.     Yet, instead of complying with its above obligations regarding Jubilant Confidential Information, Dechra informed Jubilant that it would retain and continue using Jubilant Confidential Information.  Dechra also refused to provide the Bio-Equivalence Studies to Jubilant.

68.     Dechra further informed Jubilant that it would violate its above obligations regarding Jubilant Confidential Information by effectuating a transfer of Jubilant Confidential Information to TRiRx Pharmaceutical Services ("TRiRx").

69.     TRiRx is a Contract Manufacturing Organization ("CMO") that provides a range of services to the pharmaceutical and biotech industries.  It specializes in drug development, formulation, manufacturing, and analytical testing services for both small and large molecules.

70.     TRiRx is not authorized under the Agreement, or by Jubilant, to possess or use Jubilant Confidential Information.

71.     As such, Dechra's continued use and retention of Jubilant Confidential Information

through its current or future transfer of Jubilant Confidential Information to TRiRx violates the Agreement.

72.      Dechra's continued use and retention of Jubilant Confidential Information through its current or future transfer of Jubilant Confidential Information to TRiRx also violates Federal and Maine law.

73.      Dechra knew that transferring and/or continuing to use Jubilant Confidential Information after the Agreement terminated violates the Agreement.

74.      Dechra knew that transferring and/or continuing to use Jubilant Confidential Information after the Agreement terminated violates Federal and Maine law.

75.      After receiving Dechra's February 28, 2023 notice that it would no longer honor its duties and obligations to stop using Jubilant Confidential Information and either return or destroy Jubilant Confidential Information, Jubilant immediately informed Dechra that its continued use and retention of Jubilant Confidential Information was not authorized and violated both the terms of the Agreement and Federal and Maine law.

76.      Jubilant also, and once again, demanded the return of the Bio-Equivalence Studies.

77.      Unfortunately, Dechra refused to return the Bio-Equivalence Studies, and also refused to cease using Jubilant Confidential Information.

78.      As a result, Jubilant's counsel notified Dechra on April 21, 2023 that Jubilant demanded the return of all Jubilant Confidential Information, including the Bio-Equivalence Studies, and the immediate cessation of Dechra's, TRiRx's or any third party's use of Jubilant Confidential Information.  (A copy of Jubilant's April 21, 2023 letter to Dechra is attached as Exhibit C).

79.      Dechra responded to Jubilant's April 21, 2023 letter on May 1, 2023. (A copy of

Dechra's May 1, 2023 letter is attached as Exhibit D). In its May 1st letter, Dechra falsely claimed that it owned the Bio-Equivalence Studies, Jubilant agreed to Dechra providing Jubilant Confidential Information to TRiRx, and Dechra was entitled to keep Jubilant Confidential Information because it "suffered damages."

80.      Dechra's false claim that it is entitled to keep and disseminate Jubilant Confidential Information after the Agreement terminates is particularly egregious given that Section 10.2 specifically states that Dechra can only use Jubilant Confidential Information "for the purpose of exploiting its rights and fulfilling its obligations pursuant to this Agreement" and Section 10.3 unequivocally requires Dechra "upon termination for any reason whatsoever or expiration of this Agreement … to cease mak[ing] use of the Confidential Information disclosed to it by the other Party and either return to the other Party all Documents bearing Confidential Information and all copies thereof or certify to the other Party in writing that such Confidential Information and all copies thereof have been destroyed."

81.      Moreover, if Dechra suffered "damages," as it claims (and which Jubilant disputes) in its May 1st letter, Dechra is free to pursue those damages in Arbitration pursuant to Section 14.1 of the Agreement, which provision makes an exception for any violation of any obligation under section 10 of the Agreement.

**Irreparable Harm to Jubilant**

82.      Dechra is harming Jubilant's legitimate business interests, including its Confidential Information and goodwill.

83.      For example, by retaining and refusing to turnover the Bio-Equivalence Studies, Dechra is prohibiting Jubilant from using and benefitting from its Confidential Information.

84.      Dechra, by possessing and using Jubilant Confidential Information, is also using

Jubilant Confidential Information to unjustly enrich itself.

85.     In addition, Dechra can share (and unapologetically is sharing or planning to share) Jubilant Confidential Information with others, including Jubilant competitors.  Dechra and Jubilant competitors can then use Jubilant Confidential Information to compete with Jubilant and/or erode the value of Jubilant Confidential Information.

86.     Jubilant Confidential Information and goodwill is therefore at risk and injury to Jubilant is both probable and imminent because Dechra clearly intends to continue violating the Agreement and the law by using, possessing and/or retaining Jubilant Confidential Information and sharing Jubilant Confidential Information with third parties who are not authorized to use or possess Jubilant Confidential Information.

87.     Put another way, Jubilant is suffering irreparable harm, which may not be adequately rectified or compensated by monetary damages.

88.     Injunctive relief is therefore necessary and appropriate to prevent further damage to Jubilant.

## COUNT I
### (Breach of Contract)

89.     Jubilant repeats and realleges each and every allegation contained in paragraphs 1 through 88 of the Complaint, as if fully set forth herein.

90.     Jubilant and Dechra entered into a contract on or about December 10, 2007, and an Amendment #1 to the contract on or about March 28, 2018 (collectively, the Agreement").  (Exhibit A).

91.     The Agreement is a valid and enforceable contract.

92.     Under the Agreement, Dechra promised to provide all Bio-Equivalence Studies, which are Jubilant Confidential Information, Project IP and property, to Jubilant.

93.     Under the Agreement, Dechra promised, upon termination of the Agreement, to return all Jubilant Confidential Information to Jubilant or destroy all Jubilant Confidential Information.

94.     Dechra further promised to not use Jubilant Confidential Information for any purpose other than carrying out the provisions of the Agreement and to cease using Jubilant Confidential Information once the Agreement terminated. This obligation is also mandated by the Confidentiality Agreement.

95.     Jubilant performed all of the duties and obligations it owes Dechra under the Agreement.

96.     Dechra breached the Agreement and the Confidentiality Agreement, and continues to breach the Agreement and the Confidentiality Agreement, by, among other things:

- Refusing to return the Bio-Equivalence Studies to Jubilant;

- Continuing to possess, access and use Jubilant Confidential Information;

- Refusing to return Jubilant Confidential Information to Jubilant; and

- Providing Jubilant Confidential Information to third parties (such as TRiRx) who are not authorized to use, access or possess Jubilant Confidential Information.

97.     Jubilant has incurred significant damages as a result of Dechra's breach of the Agreement and the Confidentiality Agreement.  Dechra's illegal actions have damaged Jubilant's goodwill, reputation, and legitimate business interests.  Jubilant's damages are in excess of $75,000.00.

98.     Moreover, Dechra's breaches of the Agreement and the Confidentiality Agreement are continuing and cannot be fully compensated through monetary damages.

99.     Jubilant is subject to continuing irreparable harm, economic injury, and damage to its Confidential Information, goodwill and business reputation as a result of Dechra's illegal

activity.

100.    Jubilant has no adequate remedy at law and, unless injunctive relief is granted, Jubilant will continue to be irreparably harmed by Dechra's breach of the Agreement and the Confidentiality Agreement in a manner that is not fully compensable by money damages.

101.    Jubilant therefore requests that this Court grant injunctive relief against Dechra that prohibits Dechra from a) using, possessing or accessing Jubilant Confidential Information and b) transferring Jubilant Confidential Information to any third party.

102.    Jubilant further requests that this Court order Dechra to immediately return to Jubilant all Jubilant Confidential Information and property, including the Bio-Equivalence Studies, in the custody, possession, or control of Dechra.

## <u>COUNT II</u>
### (Misappropriation of Trade Secrets – Maine Trade Secrets Act)

103.    Jubilant repeats and re-alleges each and every allegation contained in paragraphs 1 through 103 of the Complaint, as if fully set forth herein.

104.    During the course of the Agreement, Dechra was exposed to substantial amounts of Jubilant Confidential Information.

105.    For instance, Dechra had access to the information identified in paragraphs 6, 37, 38, 45, 46, 47, 48, 49, 50, 51 and 52.

106.    The Confidential Information identified in paragraphs 6, 37, 38, 45, 46, 47, 48, 49, 50, 51 and 52 is not available to the general public and is closely guarded by Jubilant.  Jubilant keeps such information strictly confidential in order to protect its legitimate business interests and to maintain an advantage in the highly competitive pharmaceutical business.

107.    This information is considered a trade secret under the Maine Uniform Trade Secrets Act ("MTSA"), 10 M.R.S. §§ 1541-1548, because Jubilant derives independent economic

value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

108.    The economic value of the Jubilant trade secrets/Confidential Information Dechra had access to under the Agreement and the Confidentiality Agreement is over $1,000,000.00.

109.    Under the MTSA, "actual or threatened misappropriation [of trade secrets] may be enjoined."  10 M.R.S.§1543.

110.    Dechra misappropriated and is misappropriating Jubilant trade secrets by refusing to return Jubilant Confidential Information and using Jubilant Confidential Information.

111.    Moreover, Dechra's refusal to return Jubilant Confidential Information constitutes the "threatened" misuse of Jubilant trade secrets and injunctive relief is therefore appropriate.

112.    Accordingly, Jubilant requests that this Court enter an order enjoining Dechra from using, possessing or accessing any Jubilant Confidential Information, and from disclosing Jubilant Confidential Information to anyone not authorized to receive the Confidential Information.

113.    Jubilant also requests that this Court enter an order requiring Dechra to return any and all Jubilant Confidential Information to Jubilant, as Dechra is required to do pursuant to the Agreement, the Confidentiality Agreement and the MTSA.

114.    In addition, Dechra's actions have damaged Jubilant's Confidential Information, goodwill, reputation, and legitimate business interests.

115.    Jubilant is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

116.    Finally, Dechra's misappropriation of Jubilant's trade secrets was willful and malicious.

117.    Jubilant therefore also  requests an award of compensatory damages, exemplary damages, and reasonable attorneys' fees as a result of Dechra's willful and malicious misappropriation of Jubilant trade secrets.

## Count III
### (Violation of Federal Defend Trade Secrets Act)

118.    Jubilant repeats and realleges paragraphs 1 through 118 of the Complaint, as if fully set forth herein.

119.    During the course of its relationship with Jubilant, Dechra was provided access to substantial amounts of Jubilant Confidential Information, including the Confidential Information identified in paragraphs 6, 37, 38, 45, 46, 47, 48, 49, 50, 51 and 52.

120.    Jubilant Confidential Information is not available to the general public and is closely guarded by Jubilant. Jubilant keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

121.    Jubilant Confidential Information is considered a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* ("DTSA"), because the information is not generally known outside of Jubilant's business, the information is not generally known by employees and others involved in Jubilant's business, Jubilant has taken reasonable measures to guard the secrecy of the information, the information is of great value to Jubilant and its competitors, Jubilant invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because Jubilant continuously uses the information in its business.

122.    Dechra was under a contractual obligation, both under the Agreement and the Confidentiality Agreement, to return Jubilant Confidential Information to Jubilant immediately upon termination of the Agreement.

123.    Dechra, however, ignored (and continues to ignore) its contractual obligations by maintaining and possessing Jubilant Confidential Information, using Jubilant Confidential Information to unfairly compete with Jubilant, and passing Jubilant Confidential Information along to third parties who are not authorized to receive, possess, or access Jubilant Confidential Information.

124.    Unless restrained, Dechra will continue to use, divulge, disclose, acquire and/or otherwise misappropriate Jubilant Confidential Information.

125.    Furthermore, actual or threatened misappropriation of confidential information may be enjoined under the DTSA.

126.    It is axiomatic that if Dechra is actively using Jubilant Confidential Information and ignoring the terms of the Agreement and the Confidentiality Agreement, then Dechra has no intention of complying with the DTSA.

127.    Consequently, Dechra's actions constitute the actual and/or threatened misuse of Jubilant Confidential Information.

128.    Injunctive relief against Dechra is therefore appropriate.

129.    Naturally then, Jubilant requests an order enjoining Dechra from using, possessing or accessing Jubilant Confidential Information and from disclosing Jubilant Confidential Information to anyone not authorized to receive the Confidential Information.

130.    Jubilant further requests an order requiring Dechra to return any and all Jubilant Confidential Information to Jubilant.

131.    Finally, Dechra's misappropriation of Jubilant Confidential Information has been willful and malicious, and Jubilant has incurred significant damages as a result of Dechra's misappropriation.

132.     Dechra's actions have also damaged Jubilant's Confidential Information, good will, reputation, and legitimate business interests.

133.     Jubilant is therefore entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from Dechra's wrongful misappropriation of Jubilant Confidential Information.

**Count IV**
**(Replevin)**

134.     Jubilant repeats and realleges paragraphs 1 through 102 of the Complaint, as if fully set forth herein.

135.     Dechra is currently in possession of Jubilant Confidential Information, including, but not limited to, the Bio-Equivalence Studies and the Confidential Information and property identified in paragraphs 6, 37, 38, 45, 46, 47, 48, 49, 50, 51 and 52.

136.     Dechra does not have any lawful justification to be in possession of the Jubilant Confidential Information identified in paragraphs 6, 37, 38, 45, 46, 47, 48, 49, 50, 51 and 52.

137.     Jubilant is the rightful owner of the aforementioned Confidential Information and is entitled to the return of the Jubilant Confidential Information being wrongfully withheld by Dechra.  In other words, Dechra's retention of Jubilant Confidential Information is without lawful justification and a clear violation of Jubilant's rights.

138.     Jubilant made it clear to Dechra that its continued possession of Jubilant Confidential Information is unauthorized and constitutes an unlawful act.  Jubilant has also made several requests and attempts to retrieve Jubilant Confidential Information from Dechra.

139.     Unfortunately, Dechra still refuses to return Jubilant Confidential Information.

140.     Accordingly, a replevin action is appropriate because Jubilant is being wrongfully deprived of its Confidential Information and seeks the return of its Confidential Information.

141.     Consequently, Jubilant requests that the Court enter an order: a) granting the immediate return of Jubilant Confidential Information to Jubilant; b) restraining Dechra from further interfering with Jubilant Confidential Information; and c) compensating Jubilant for any damages incurred as a result of Dechra's unlawful possession of Jubilant Confidential Information.

**WHEREFORE**, Plaintiff Jubilant Generics Limited respectfully requests that this Court:

1.     Enter an injunction enjoining and restraining Dechra Veterinary Products, LLC, and its agents, representatives, associates, employees, and all those acting in concert or participation with Dechra, from:

        (a)     Using, possessing or accessing any Jubilant Confidential Information and Project IP; and

        (b)     Disclosing and/or transferring Jubilant Confidential Information and Project IP to anyone not authorized to receive the information.

2.     Enter an order requiring Dechra to return all Jubilant Confidential Information, Project IP and/or property in its possession, custody or control to Jubilant;

3.     Enter judgment against Dechra for compensatory damages in an amount to be determined at trial;

4.     Enter judgment against Dechra for punitive damages in an amount to be determined at trial;

5.     Award Jubilant the costs and expenses, including reasonable attorneys' fees, Jubilant incurs as a result of Dechra's breach of Section 10 of the Agreement, and the Confidentiality Agreement;

6.     Award Jubilant the costs and expenses, including reasonable attorneys' fees, Jubilant incurs as a result of Dechra's violation of the Maine Trade Secrets Act and Federal Defend Trade Secrets Act; and

7.      Award Jubilant such other relief as the Court may deem just and proper.


Dated:  June 7, 2023                                     Respectfully submitted,

                                                        /s/      Bernard J. Kubetz

                                                        Bernard J. Kubetz
                                                        **Eaton Peabody**
                                                        100 Middle Street
                                                        P.O. Box 15235
                                                        Portland, Maine 04112-5235
                                                        Phone: 207-274-5266
                                                        Fax: 207-274-5286
                                                        Email: bkubetz@eatonpeabody.com


                                                        J.   Scott   Humphrey   (*Pro   Hac   Vice
                                                        Forthcoming*)
                                                        Rebecca Dircks (*Pro Hac Vice Forthcoming*)
                                                        John N. Dagon (*Pro Hac Vice Forthcoming*)
                                                        **Benesch, Friedlander, Coplan & Aronoff
                                                        LLP**
                                                        71 South Wacker Drive, Suite 1600
                                                        Chicago, Illinois 60606-4637
                                                        Telephone:  312.212.4949
                                                        Facsimile:  312.767.9192
                                                        Email: shumphrey@beneschlaw.com
                                                        kburnett@beneschlaw.com

                                                        *Attorneys  for  Plaintiff  Jubilant  Generics
                                                        Limited*

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Sanjay Gupta, on behalf of Jubilant Generics Limited, declare under penalty of perjury that the statements set forth in the foregoing Verified Complaint for Injunctive and Other Relief are true and correct except as where such statements are made upon Company records, information and belief.

Dated:  May 5, 2023

(Sanjay Gupta)
POA Holder
Jubilant Generics Limited